# AFFIDAVIT

3:20-MJ-1172

I, Paul Hughes, a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and being duly sworn, depose and state as follows:

## Introduction

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for renewed authorization for real-time geolocation data about the location of the cellular telephone assigned call number (865) 202-1776, the ("TARGET PHONE"). The TARGET PHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3123(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

## Agent Background and Experience

3. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

4. I am a Special Agent with the FBI. I have been an FBI agent for approximately 19 years. In total, I have worked in law enforcement for approximately 33 years. As a Special Agent, I investigate violations of federal drug laws and violent crimes, including, but not limited to,

violations of Title 21, United States Code, Sections 841, 846, and Title 18, United States Code, Sections 2, 1201.

5. During my law enforcement career, I have participated in numerous drug trafficking investigations involving various types of drugs, including cocaine and cocaine base, heroin, methamphetamine, crystal methamphetamine, and marijuana. I have also participated in numerous violent crime investigations. I am personally familiar with and have used all routine methods of investigation, including, but not limited to, visual surveillance, electronic surveillance, informant and witness interviews, interrogation, and undercover operations. I have closely participated in several federal wiretap investigations that resulted in a number of arrests and seizures concerning drug trafficking. I have analyzed telephone toll records and other records and debriefed informants regarding the use of telephones. I am also familiar with the surveillance technique that this warrant application requests to utilize.

6. Providers of cellular services have the ability to provide geolocation information for phones on their network. When this information is made available to law enforcement, investigations of drug trafficking groups are advanced in at least two important ways. Knowing an approximate location of a particular phone greatly facilitates and enhances physical surveillance of the user of that phone and other criminal actors with whom the user associates. Moreover, officers and agents can conduct physical surveillance more conservatively, which helps protect the covert nature of the investigation. Secondly, the availability of geolocation information enables law enforcement to monitor and log the user's movements over time and space. This provides insight into locations commonly visited by the user, which can lead to the identification of other associates, either through their association with known physical locations or by helping law enforcement prioritize and select future physical surveillance locations.

7.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.  The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a District Court of the United States that has jurisdiction over the offense being investigated.

## Probable Cause

9.  Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A), have been committed, are being committed, and/or will be committed as explained below. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and/or will lead to the identification of individuals who are engaged in the commission of these offenses.

*Background of the Investigation*

10. In October of 2019, the Knox County Sheriff's Office Narcotics Unit (hereinafter referred to as "KCSO") received information from a confidential informant (hereinafter referred to as "CI") regarding a potential drug trafficking organization operating in the Knoxville City and Knox County area. KCSO utilized the CI for the controlled purchase of evidence; specifically, substances believed to be and represented as heroin. Between October 13, 2019, and February 29, 2020, KCSO conducted five controlled evidence purchases from individuals identified as Dejuan WELLS, Dwight WALKER, Lester RONDEAU, and an unknown black male known as "Lucky." These subjects have operated in concert with each other under the organization to distribute heroin,

but have not necessarily been all together during each narcotics transaction. Between June 19, 2020 and July 8, 2020, KCSO conducted surveillance operations on WALKER. During these operations, law enforcement observed several hand-to-hand drug transactions and observed WALKER leaving 1440 Kenton Way, Knoxville, Tennessee.

11. Based on the previously listed controlled purchases of heroin and the surveillance operations, KCSO applied for and was granted a state search warrant for the premises of 1440 Kenton Way, Knoxville, Tennessee. During the search, KCSO recovered the following:

- Approximately 34 grams of suspected heroin from the bar top; in individually packaged, personal use bags
- Approximately 142 grams of suspected heroin from the kitchen pantry (Field tested positive for heroin and morphine)
- Approximately 23 grams of suspected heroin from a kitchen drawer
- Numerous plastic baggies throughout the residence
- Two sets of scales; one of which was a digital scale with powder residue
- Approximately $12,000 US Currency throughout the residence
- A Glock, Model 43, 9mm caliber, semi-automatic handgun located on the couch in the living room

Dejuan WELLS and Kenyetta TYLER were the occupants of the residence and both were arrested and charged in Knox County for narcotics violations. WELLS was also charged for the firearm. Curtis LEE had also signed a lease agreement for the address of 1440 Kenton Way, Knoxville, Tennessee; dated January 19, 2020.

12. In May of 2020, the Knoxville Police Department Organized Crime Unit (hereinafter referred to as KPD-OCU) began to utilize CIs to conduct controlled evidence purchases of heroin

from unknown individuals in the Knoxville area, who were driving a dark colored, newer model Chevrolet Malibu with Massachusetts registration plates #8ZR381 (hereinafter referred to as "BLACK MALIBU"). During the investigation, it was discovered that the vehicle was being shared between numerous unknown individuals to distribute heroin in the Knoxville area. Between May 2020 and late August 2020, the KPD-OCU, utilizing CIs, conducted a total of three controlled evidence purchases from the group of individuals operating in the Knoxville area, during two of the transactions, the BLACK MALIBU was being utilized by at least one individual of the organization; the total weight of suspected heroin purchased during the three transactions was 1.7 grams. Two of those individuals, operating the vehicle and conducting heroin transactions were identified as LEE and WILSON. During the remaining transaction, the unknown target, only known by the alias "Fats" was driving a blue Hyundai with West Virginia registration plates that was suspected to be a rental vehicle, but the tag was found to not be registered.

13. In late August 2020, the KPD-OCU requested the assistance of the ATF and the FBI to assist with the investigation of this drug trafficking organization (DTO) which was found to be linked to Detroit, Michigan. Between August 1, 2020 and October 5, 2020, the ATF assisted KPD-OCU with six controlled purchases of heroin from the DTO, in the Knoxville area, utilizing an ATF Special Agent in an undercover capacity; the total amount of suspected heroin purchased from the DTO is approximately 15.5 grams. During each purchase of evidence, an individual from the DTO, to include LEE and WILSON (sometimes together), as well as another unknown black male, drove the BLACK MALIBU. After one of the controlled purchases, law enforcement conducted surveillance of the BLACK MALIBU for several hours with the assistance of the FBI utilizing air support. During the surveillance, law enforcement observed several other narcotics transactions at other locations in the Knoxville area. Even with surveillance on the units on the

ground and in the air; law enforcement was still unable to determine the final location where the BLACK MALIBU was parked during the night when narcotics transactions were not being conducted.

14. During the four most recent controlled drug purchases conducted by the undercover ATF Agent, the ATF Agent called telephone number (865) 202-1776, (hereinafter referred to as the TARGET PHONE) to facilitate the drug transaction. The TARGET PHONE had been identified through the CI who introduced the undercover ATF Agent to LEE during a controlled drug purchase.

15. On October 21, 2020, while conducting surveillance on the BLACK MALIBU, law enforcement observed LEE and WILSON enter the BLACK MALIBU at the address of 1827 Riverside Drive, Knoxville, Tennessee.

16. On October 23, 2020, U.S. Magistrate Judge Debra C. Poplin issued a tracker warrant for the BLACK MALIBU connected with this case. When agents arrived at the previously known location of the vehicle on Sunday, October 25, 2020 to place the tracker warrant on the BLACK MALIBU, the vehicle was not present.

17. On October 29, 2020 a CI was debriefed regarding the CI's knowledge of and interactions with LEE and other members of the DTO. The CI explained that the CI has regularly purchased heroin from LEE and his associates while utilizing the TARGET PHONE to contact LEE and or associates in furtherance of those transactions. The CI has utilized the TARGET PHONE as recently as Monday, October 26, 2020 in order to purchase heroin from LEE. The CI was shown a photograph of LEE and an unidentified associate of LEE standing next to the BLACK MALIBU. The CI identified the BLACK MALIBU as the same vehicle LEE and his associates use to conduct heroin transactions with the CI while utilizing the TARGET PHONE.

## CONCLUSION AND AUTHORIZATION REQUEST

18. Based on the foregoing facts and circumstances, there is probable cause to believe that LEE and WILSON and other known and unknown targets, distribute heroin in Knox County, Tennessee. Further, there is probable cause to believe LEE, WILSON and other known and unknown targets utilize the TARGET PHONE to meet sources of supply to purchase heroin to distribute to customers in the Eastern District of Tennessee.

19. There is probable cause to believe that the installation of a geo location tracker on the TARGET PHONE will constitute evidence of a crime, lead to the seizure of evidence, contraband, fruits of a crime, or other items illegally possessed, and property designated for use, intended for use, or used in the commission of a crime. The installation of a geo location tracker on the TARGET PHONE will assist law enforcement with confirming the personal location of members of the DTO (confirming their location will be especially important when other law enforcement techniques are used in conjunction with this information), where they obtain drugs (and possibly lead to identifying their source of supply), where they stay, where they conduct drug sales, where they store the proceeds of drug sales, and will otherwise lead to the discovery of evidence that will further the investigation. The need to locate the TARGET PHONE thus satifies the requirement of Rule 41 of the Federal Rules of Criminal Procedure.

### Location Technical Information

20. In my training and experience, I have learned that many wireless cellular telephone service providers provide cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including

E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the phone's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless phone does not necessarily serve every call made to or from that phone. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

## AUTHORIZATION REQUEST

21. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

22. This is a long term investigation of a sophisticated Drug Trafficking Organization that is operating in multiple states, involves the use of informants, confidential sources, judicially authorized surveillance, and other investigative methods. I do not anticipate that this investigation will be completed in the near future. I therefore request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the TARGET PHONE would seriously jeopardize the ongoing

investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

23. I further request that the Court direct the relevant wireless provider to disclose to the government any information described in Attachment B that is within the possession, custody, or control of the wireless provider I also request that the Court direct the wireless provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the wireless provider's services, including by initiating a signal to determine the location of the TARGET PHONE on the wireless provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the wireless provider for reasonable expenses incurred in furnishing such facilities or assistance.

24. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET PHONE outside of daytime hours.

Respectfully submitted,

*[signature]*

PAUL HUGHES
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on October 30, 2020.

*[signature]*

DEBRA C. POPLIN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

1.  A cellular telephone bearing the number (865) 202-1776, the ("TARGET PHONE"). The TARGET PHONE is serviced by VERIZON.

2.  Records and information associated with the above Cell Phone number that is within the possession, custody, or control of the wireless provider, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

# ATTACHMENT B

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of VERIZON, including any information that has been deleted but is still available to the VERIZON or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), VERIZON is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following information about the customers or subscribers associated with the SUBJECT ACCOUNT for the time period June 1, 2020 to October 30, 2020:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet

Protocol ("IP") address); and

    viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and all records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the SUBJECT ACCOUNT, including:

    (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    (B) information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received; as well as per-call measurement data (also known as "real-time tool" or "RTT", including PCMD records, NELOS records, TrueCall records, and all other records containing timing advance measurements and distance-to-tower measurements for all technologies.

 b. Information associated with each communication to and from the SUBJECT ACCOUNT for a period of 30 days from the date of this warrant, including:

    i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii. Source and destination telephone numbers;

    iii. Date, time, and duration of communication; and

    iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the SUBJECT PHONE will connect at the beginning and end of each communication as well as any per-call measurement data (also known as "real-time tool" or "RTT", including PCMD records, NELOS records,

TrueCall records, and all other records containing timing advance measurements and distance-to-tower measurements for all technologies; and

    c.      All information about the location of the Target Cell Phone described in Attachment A for a period of 30 days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the paragraphs 2.b and 2.c (hereinafter, "Location Information") is within the possession, custody, or control of VERIZON, VERIZON is required to disclose the Location Information to the government. In addition, VERIZON must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with VERIZON's services, including by initiating a signal to determine the location of the Target Cell Phone on VERIZON's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate VERIZON for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. §§ 846, and 841(a)(1) involving LEE or unidentified subject(s) during the period of June 1, 2020 to October 30, 2020.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.